at all. All arguments not to exceed 20 minutes per side. Mr. Daniel Winnick for the appellants. Yes. Good morning, your honor. May it please the court, Daniel Winnick for the federal government. I'd like to reserve four minutes for rebuttal, if I may. Very well. This facial challenge to the offset provision rests on the incorrect premise that the provision bars states accepting fiscal recovery funds from cutting taxes. As the Eighth Circuit recognized last week, the provision does no such thing, either by its plain terms or as interpreted by the Treasury Department. It leaves states taxing powers exactly as they were before they accepted this large infusion of federal funds. They can cut taxes as long as they can pay for the negative revenue effects of any such tax cut using their own money, whether through an increased revenue because of economic growth, or through increases to other taxes, or through cuts in their own spending. The one thing they can't do is use these new federal funds to balance the negative revenue effects of a tax cut on their budget. And that's why- So all of those ways that the state can comply came about through the rule that was promulgated by Treasury, correct? I don't think that's correct, Your Honor. The rule follows from the plain text of the statute. The statute is a restriction on using these new federal funds to offset- Then why did Treasury promulgate the rule, if it's clear from the statute? Well, the Treasury promulgated the rule pursuant to the authority Congress gave it because it required, you know, it had to spell out exactly how it would go about implementing this restriction. And, of course, there's numerous other parts of the fiscal recovery fund that had to be implemented through regulation. But the regulation doesn't add to the basic provision of the statute that this is a condition against using these federal funds to pay for a tax cut. It is not a restriction on cutting taxes if you accept fiscal recovery funds. Again, that's clear from the plain text of the statute. To the extent the statute in its plain terms could have been read any other way, the canon of constitutional avoidance would, of course, preclude giving it a reading that would give rise to constitutional concerns in the face of a textually and constitutionally sound alternative. Well, didn't Treasury recognize in its commentary to the rule that the statute could be read to mean, you know, tax funds are fungible? Wasn't that- I think there's a- I've got a quote here. Consistent with the statutory text, the approach taken in the interim final rule recognizes that because money is fungible, even if SLFRF funds are not explicitly or be used in a manner inconsistent with the statute by indirectly being used to substitute for the state's or territory's funds that would otherwise have been needed to cover the cost of the reduction. So it seems like Treasury recognized that that interpretation was a conceivable way of looking at the statute. So that interpretation is, and that's the interpretation that's consistent with the final rule, but that's not the interpretation that the states argue would render the rule- What the states say would make the statute unconstitutional is if it bans tax cuts. And what Treasury is saying there, and what the rule says, is because money is fungible, what you cannot do is take these funds, use them to displace your existing expenditures for a given agency or department, and then take that saved money and use it to pay for a tax cut. That is indistinguishable in functional terms from using the money in an explicit or direct way to pay for the tax cut. So that's why Treasury implemented the plain language of the statute by saying that sort of indirect offset is just as much a violation as a direct offset. But the Treasury has never said and doesn't believe that it's consistent with the plain text of the statute to say that a state accepting these funds violates the provision if it cuts taxes using its own money, if it has enough state funds to cut taxes without the need to rely on these federal funds to balance its budget. So it's Treasury's position that the rule is not necessary at all for the statute to go into effect and apply and be valid as a matter under the spending clause? That's correct. The rule doesn't supply any, you know, the needed clarity for PENR's purposes or otherwise to implement the statute. So you agree we should just be looking at the statute itself to determine whether it  On the merits, this is a challenge to the statute. It's not a challenge to the rule. This is a constitutional challenge to the statute itself. The statute is certainly, or I'm sorry, the regulations are certainly relevant here to jurisdiction because to the extent you could have read the original statute to create a concrete controversy over the, you know, what the states are challenging, in other words, to suggest that there was a concrete possibility that it might be applied in the way that the states argue would be and thus destroys any concrete injury that the court might have thought the states had. Is that an injury argument or is that a mootness argument? Well, I think it's... I mean, we measure standing at the time the suit was filed, right? So subsequent event like a rag, it's not going to deprive you of standing in the sense that your injury is not an injury in fact anymore, right? So, you know, we usually sort of think about mootness developments as factual. I mean, I think what... It's a little hard to say how to categorize it here. I think the question in this case has always been, is there a concrete controversy over, you know, the constitutional challenges? The state's argument has always been that this statute is unconstitutional because it bans tax cuts. We don't think that was ever a possibility even before the regulations issued. The regulations make even clearer that Treasury isn't applying the statute in that way. So I think it's hard to say whether it's... That's a merits argument. I mean, that would be an injury though, wouldn't it? I mean, all they have to do is allege an injury, right? I mean, the standing bar is not that high. They've alleged a violation of the spending. I mean, one thing confuses me about this case, about all these cases, is I don't understand exactly what the cause of action is. I guess it's an implied cause of action under the Constitution, under the Spending Clause or the 10th Amendment or whatever it is, right? It's kind of like a Bivens claim to enforce the Spending Clause. So assume that that's the cause of action. Why isn't the injury then just, hey, I'm being coerced or you're putting conditions on the money or whatever I mean, I've got a plausible sovereign injury claim under the Spending Clause. That would be enough, right? Two points on that, Your Honor. First, this isn't at the pleading stage as the Arizona and Missouri cases were. So the Arizona court relied expressly on the fact that it was at the pleading stage and said that the states had adequately alleged a sovereign injury. This is on final judgment. To support the injunction that they obtained, the states had to actually show with evidence, not just allege that they had a sovereign injury. Second, even at the pleading stage, legal conclusions aren't entitled to truth. The states have based this entire case on the legal premise that the offset provision bans tax cuts. That's wrong as a matter of law. It was always wrong as a matter of law. And so this is not a situation where they are entitled to have their legal understanding of the statute taken as true. What the Eighth Circuit said But, okay, so you're just saying they lose on the merits, right? Their interpretation of the statute is erroneous on the merits they lose. I mean, it's not a justiciability question, right? It's just a merits question? With respect, Your Honor, I don't think that's right. And the reason it's not right is that the merits here are constitutional challenges to the statute as they have imagined it to be. So they have said, if the statute bans tax cuts, it's unconstitutional. And as the Eighth Circuit said, the statute doesn't ban tax cuts. It certainly hasn't been understood to ban tax cuts. And therefore, there's no is basically a request for an advisory opinion. They are asking the Court to enjoin a hypothetical statute or a hypothetical interpretation of the statute that Congress has never adopted and that the Treasury Department has not adopted. There's no jurisdiction over that. Now, look, the merits here are related in the sense that the basic reason the State's constitutional challenges fail is that the statute doesn't do what they say it does. And therefore, there's no constitutional problem with it. But we do think there is a genuine jurisdictional problem here, which is, at its core, the States are challenging a statute that doesn't exist. Counsel, let me ask you for clarification here. I know you said that you talked about the relationship between the injury effect of the merits and the jurisdictional argument. Can we decide whether there is an injury effect without reaching the merits? Or are they so to determine the jurisdictional, the standing question? Well, I do think they're distinct, Your Honor, because the merits, again, I think are the constitutional issues. You don't have to get into the constitutional issues to say there's no jurisdiction here. What you have to say is that the constitutional challenges are challenges to a statute that bans tax cuts or that can be read to ban tax cuts. And that is not the statute Congress passed. And it's certainly not how the Treasury has understood the statute. That's why, again, the Eighth Circuit's opinion, I think, is very sound on this point. It says we're not going to reach these constitutional issues because that just isn't the statute we have before us. I want to ask you about the compliance costs. That seems to be something, at least Tennessee in this case has submitted a declaration detailing compliance costs in order to prevent a recoupment action. And that seems to be a distinct injury that's different than, you know, whether there's an imminent risk of a recoupment action. They've actually alleged, I believe they allege, they're doing things that cost them money so that they can prevent an action from being brought. Why isn't that an injury? It may be an injury, but it's not redressable. So the reporting provision of the statute, section 602D, says states have to keep track of and report changes to their tax revenue sources. So even with an injunction against the offset provision, that reporting provision is in effect and it requires them to do everything that they say they're having to spend money to do. I do want to make sure to address the merits. Yeah, but the reporting provision just says that you have to report what you're, you know, determining what the baseline, you know, I think you have to do the inflation adjustment. Those are things that they're doing that seem to be different than just simply reporting how they're using the ARPA funds. So two corrections, I think, Your Honor. First, the reporting requirement doesn't just say you have to report on how you're using the funds. It says you have to report, quote, modifications to your, quote, tax revenue sources. And second, the thing that they say they're having to spend money to do is that they're having to compute modifications to their tax revenue sources that they don't have to compute as a matter of the state balanced budget requirement. Namely, if they defer the collection of a tax, they don't have to count that for the balanced budget requirement, but they do have to count it for this purpose. And they would, for the reason I just read in the statute, they would have to do that to comply with the reporting requirement completely independent of the offset provision. On the merits, it is notable, I think, on the coercion point. The states do not contend that if this statute simply forbids the use of federal funds to pay for a tax cut, that it violates the coercion or anti-commandeering principles. They don't make that argument. Their argument rests entirely on the proposition that this statute bans them from cutting taxes using their own money. It's for very good reason that they don't make any other argument. The Supreme Court has made quite clear Congress has the power to set conditions on the way that federal funds are used. So if the court reaches the merits, their coercion and anti-commandeering arguments on which the district court based this injunction fail for the simple reason that the statute doesn't do the thing that they say would be unconstitutional. On the ambiguity arguments, I think it's crucial that no court has ever held a funding condition to be facially unconstitutional and ambiguity grounds. The Pennhurst Clarity Requirement, as a number of the opinions in this court's on-bank decision in the City of Pontiac, joined in combination by well over a majority of the on-bank court, explained, is just a rule of statutory construction. Courts apply it in resolving concrete disputes over the meaning of a funding condition. So in Arlington Central, for example, the question is, does a state have to pay the or does it not? And the court didn't look at that and say, well, judges disagree on this question. Therefore, the statute is unconstitutional. They said, judges disagree on this question. There's two readings of the statute. We're going to adopt the one of which the states had clear notice. So this just isn't at all a basis to hold the offset provision unconstitutional on its face on the ground that it could hypothetically be applied in a way that its plaintext doesn't permit, certainly doesn't require, and that the Treasury Department has said. So you're saying it's not a clear statement rule? It's not akin to a clear statement rule? So it is akin to a clear statement rule, but it's a rule of statutory construction. So if a court is faced with a concrete dispute over the application of a funding condition, what courts have said is, we will apply, you know, the version of the statute, the interpretation of the statute of which a state had clear notice. It isn't a rule that says the statute is unconstitutional on its face if it can be read in. I'm not sure I understand how that works here. Let's say, hey, the statute's ambiguous because it doesn't have like a baseline here for net tax revenue. Okay. What would the construction be? Then we would say, well, that's just a rule of statutory construction. We just get to pick one? Or, I mean, what your argument is, whatever we do, we can't say it's so ambiguous that it's unconstitutional. So if there were actually a concrete dispute between Treasury and the states over the application of this provision, a state could argue in response to that concrete dispute that the interpretation Treasury is proposing to apply is not properly applied because they didn't have clear notice of it. Now, on the specific ambiguity that Your Honor raised, that goes to, I think, the substance of what the Pennars Clarity Requirement applies or requires. As this Court explained in Cutter, the Pennars Clarity Requirement is not some super specificity requirement for spending clause statutes. Spending clause statutes don't have to be any more specific than other kinds of statutes. What Pennars requires is simply that Congress make clear that there is an enforceable condition on the use of funds. It doesn't have to specify every detail of how that condition is going to be applied any more than it does in any other sort of statute. The agency is responsible for implementing funding conditions routinely clarified by regulation exactly how they're going to apply them. I think there's a lot of room between them just, I mean, okay, fine, they specify a condition, but I mean, in arguably vague and general ambiguous terms, I mean, I don't know that that, I mean, you're saying, well, the clear statement rule just requires that they say there's a condition. Well, there's a condition. You can't, you know, use the funds to, you know, whatever, offset a reduction in that tax revenue, whatever. And if I look at that and I say, I have no idea what that means, but you're saying, well, okay, it's a condition. Nobody knows what it means, but it's a condition. I mean, that can't be enough, right? Your Honor, it certainly does not make a statute facially unconstitutional that questions met replies down the road about how it's going to be applied. If, when it is applied, a state thinks it is being applied in a way that it didn't have notice of the basic condition, then it can raise an ambiguity challenge. But on the question of sort of how much has to be spelled out in the statute itself, you know, Carter involved a challenge to RLUIPA. RLUIPA said if you, you know, if you restrict the religious exercise of people in covered institutions, you have to satisfy strict scrutiny. It's, of course, highly unclear how strict scrutiny is going to apply to a particular kind of policy. But the Court said, and every other Court to consider the issue said, you don't have to spell that out in the statute. What states have to understand is that there is a condition. They're not entitled to notice in the statute itself of every detail of how that condition is going to be applied. So that wouldn't, you know, even in the context of an as-applied challenge, that doesn't violate the Penn-Harris Clarity Requirement. And it certainly isn't a basis to enjoin the enforcement of the statute in a facial context as to, you know, any enforcement in any context, even for activity that would plainly fall within the scope of the condition by any reading. No Court has ever done that, and for very good reason. Any other questions? Thank you, Counsel. Good morning, and may it please the Court, Brett Nolan for the Appellees, the Commonwealth of Kentucky, and the State of Tennessee. Your Honors, this case is about an unprecedented power grab by the federal government in the middle of a worldwide pandemic. When Congress offered the states $200 billion in relief funds, it attached an incomprehensible condition that effectively dictates what tax policies the states may and may not enact. That kind of intrusion on an indispensable feature of state sovereignty is unprecedented. This is a nation that was founded on a revolt over the authority of the government to set taxes. Yet during a once-in-a-century pandemic, Congress used an offer of billions of dollars in rescue funds to exert control over how the states exercise that critical power. This is unconstitutional, and the District Court correctly enjoined enforcement of the law, and this Court should affirm. I guess for me, the stumbling block has been standing, and I wonder what exactly is your theory for, at least for Kentucky, and I guess you can address Tennessee too, but Kentucky, I'm wondering after you've got, and maybe it's not a standing question as much as a mootness question, now that you have this rule in place, has Kentucky contended that it couldn't cut taxes or do something now that we know what the rule is that governs the statute? So I take your question to, Kentucky does not have any evidence in the record related to how its budgeting process might be impacted negatively by the rule in terms of mootness. So why doesn't the rule just moot out Kentucky's case? It doesn't moot out Kentucky's case because, as this Court, as your opinion said, Judge Bush, earlier this year in Kentucky v. Biden, states have an Article III injury whenever the federal government invades the state's sovereign interest and traditional prerogatives, and included amongst those sovereign interests and traditional prerogatives is the state's power to set its own tax policies. It's not just about the states being able to cut any taxes or impose... So Kentucky's relying on the sovereignty argument, the sovereignty standing argument, right? It's the spending clause. What's the answer to my cause of action question, by the way? This is just an implied action under the spending clause? Right, using the Declaratory Judgment Act to bring... Yes, that's right. All right, so the sovereign, I'm curious about the sovereignty argument. Does the Susan B. Test as well, does it have to be an imminent injury to your sovereignty? I think that those are distinct questions, but I think that the injury, but I think it doesn't matter because the injury occurs when the federal government offers the state's funding with an unconstitutional condition attached, especially a condition that effectively limits the state's ability to do something like set their own tax policies. Except the money, right? But the council, the Congress didn't limit the state's ability to set tax policies, it just said you couldn't use these funds to offset a tax cut. And Kentucky always had the right, as did Tennessee, to refuse the money. Isn't that accurate? So I think there were two questions there. So the first is, the second part of you could always refuse it, that would be true in every spending clause case. Of course the states could refuse it, but the point of the unconstitutional conditions doctrine is that the states are entitled to have an offer that doesn't have unconstitutional conditions attached to it. They're entitled to money free from the unconstitutional restraint. Otherwise, the federal government could attach poison pills to any spending legislation that it wanted to in order to encourage some states to accept and some states not to accept. And nobody could ever sue over it because you could always say, well, just don't accept it if you don't like it. And I apologize, I forgot the first part of your question once I went down that road. Well, you know, the point was that the limitation, the restriction, you just can't use this to effectuate a tax cut. You can still set taxing policy, you can still do a tax cut, you just can't backfill it or offset it with this big of a money. So why is that unconstitutional? And why does that interfere with their ability to implement tax policy or set tax policy? The problem, Judge Donald, is the use of the word indirectly to talk about offsets when you're talking about the fungibility of money. We use an example in our brief, a state spends a million dollars of ARPA funds, it cuts its budget here, it cuts taxes here. Under the statute, there is no way to know what offset what in that situation. Because money is fungible, everything could be an indirect, everything that the state does to its budget could be an indirect offset, could not be an indirect offset. I think the district court in Ohio when the court was talking about this problem said it is as if the statute vests unlimited discretion to the secretary to decide what is and is not an offset. And this goes back to, I think, Judge Bush's question earlier in the argument about whether or not it's the rule or the statute that provides these guide rails. It's the rules. Because if you read the statute, there's nothing in the statute that really tells you what is and is not an indirect offset. There's nothing in the briefs without relying on the rules that tells you what is and is not an offset. Which I think goes to your point, Judge Nowbandian, about the question of the constitutional test for ambiguity and whether or not you can facially bring it or not facially bring it. The problem in this case, and this case is unique compared to other spending clause cases, we admit that, is that this statute has no meaning on its own. The alternative definitions, what the court could say, well, we're going to construe it in this way to be, it would just be making something up. Treasury just made something up when they wrote their rule. They said, we're going to deem this to be an indirect offset and these other things aren't. The statute does not answer those questions. I mean, it's not that vague, is it? I mean, we all know what tax revenue is. We can kind of figure out what a reduction would be. A reduction from where? How long does it trace out? Is it from year to year? I mean, the year that it was passed. I mean, I don't know. We have a lot of tools in the toolbox, right? I mean, under FISA, we're supposed to work really hard when we interpret statutes now. I think that's right, but the question here is whether or not the states, when they accept that money, if they're able to know what the statute means. The question is not whether the court can come up with an interpretation that is less vague or constitutional later on. It's a question about what the states can know from reading that statute. But is there support for the idea that it's facially invalid? I think that the support is that these questions can't be answered. What does the statute mean in any circumstance? If you're looking only at the statute and not at the rule and you're asking how does the state know whether something is an indirect offset versus something else being the offset for that tax cut, what could the state do to definitively know, have any idea what the answer to that question is? I don't think there's anything in the statute that provides that answer. In the briefing, what you see is the treasury defendant saying... Why isn't that... A couple of points. Number one, I have a constitutional avoidance issue, so I'm actually supposed to construe the statute to avoid a constitutional problem. The other question, I guess, is why is this not like any other statute where, like the Clean Water Act, the Clean Air Act, whatever. Yeah, there's some vague or some things that are in the way, they're going to be regs, and everybody assumes, well, the regs are going to give us some idea and some guidance, which is what they do with everything else. Why is this any different? On the constitutional avoidance question, again, this is... To ask the question of whether this is constitutionally ambiguous, in order for the court to avoid a constitutional problem by adopting one of two competing interpretations, it would have already had to decide that the states that would receive it, and so it's already unconstitutional before the court even goes on to make that next step. On the point about other statutes, I go back... This is not a case in which a statute is vague on marginal application. This is not a case in which, in the Cutter example, the treasury has relied on where. You know what the test is in any given circumstance. You don't know beforehand whether you're going to have to spend this money or take this action under RLUIPA, because you don't know what the test case are going to be, but it's not unclear what the test is. This is a case where the core meaning of the statute, what is an indirect offset, is impossible for the states to know ahead of time when they agree to it. It's not a problem of trying to decide the right answer on issues on the margin. It's the central component of the statute. The point in time that we're looking at it is when you were made the offer. This goes back to what I was saying. You've accepted the money, right, and certified? Kentucky accepted the money after the complaint was filed. Tennessee accepted the money after final judgment with a reservation of rights about this provision. Why don't we go to self-inflicted injury then? You've already taken the money. That would always be the case for a spending clause case, right? You either just have to... Why can't you bring the case without taking the money? Would you have a concreteness problem there? I don't know if you'd have a concreteness problem, but we also think that this offer is coercive. To say, well, just don't take the money and try to bring the case ahead of time, or take the money and now you're mooted out, I don't know how any of those analyses play out. The point is that the states are entitled to an offer of funds that is constitutional. I don't think that it's mooted out by the fact that the states accept that money, and they don't want to have to comply with the unconstitutional portion of the statute. The point in time is when you were made the offer. When you were made the coercive offer, you were injured. Sovereignty is injured the moment they make the coercive offer. Correct, and I think that... The regs would be irrelevant?  Anything that happens after you're made, in theory, under your theory, anything that happens after the coercive offer is made is irrelevant to the question of whether you're injured. I guess it's a question to that particular kind of injury, of an injury to... But it could moot the case. They could still moot your case, right? If they came up with a way to say that the unconstitutional provision doesn't really Why does the rule moot the case for Kentucky? For Kentucky? Because Kentucky still is limited in its... Let me put it this way. The mootness question is whether or not a ruling from this court will have any practical effect on the parties, and with the tax mandate being enjoined, Kentucky does not have to make its tax decisions, make its revenue decisions under the cloud of the tax mandate, which lays out sort of... Is there any evidence that Kentucky is intending to violate the rule? No, but part of that is that... Then don't we have to have that in order for there not to be a mootness problem here? I don't think so. Of course, the case remains live because of Tennessee. You only need one party to have Article III standing. I think it would be sort of... I understand Tennessee is a little different than Kentucky. I'm trying to focus on Kentucky to see what Kentucky has to still be in the case. Right. Well, Kentucky's... There's not evidence about the mootness question because the mootness question didn't arise. It wasn't raised below by either the court or the party, so there's no evidence in the record about Kentucky's budgeting process and how we think that it's different than Tennessee's. Under the one plaintiff rule, even if we thought Kentucky's case was technically moot, we wouldn't dismiss Kentucky from the case. No, and that was the point that I'm making. It would be kind of... I'm sorry if I wasn't clear about that. As long as you have standing, you're still in the case even if the controversy with you guys is mooted at this point. Right. The rule is that you only need one party for Article III standing to keep the case alive. It would be very strange if a second party never had standing from the outset, for example, and then later on we're deciding whether or not the claim against them is moot when they didn't need standing in the first place. Tennessee has the compliance cost argument and the evidence in the record, so the mootness argument is probably not... I think the mootness argument is... It's not even hard in this case because of the compliance cost. The Treasury defendants, they concede that that's an injury that they face. They say it's not redressable, but the reporting requirement in the statute does not require Tennessee to calculate the revenue changes in its budget in the way that the tax mandate does, which requires Tennessee to track reductions of revenue that are attributable to foregone revenue. The reporting requirement does not require that of Tennessee. Tennessee can report its revenue changes as it normally would without the tax mandate because the tax mandate imposes specific requirements about what is and is not a tax cut that Tennessee has a different view of. I take it the Treasury defendants don't dispute that that's an injury and it's certainly redressable by enjoining the enforcement of the tax mandate. I want to go back to the merits here. What are you saying that Congress should have done? How could they have crafted this statute so it wouldn't violate the spending clause and still have a... Their purpose, it appears their purpose was that they're trying to prevent you from just taking the money from the federal government and just cutting your taxes and making all the taxpayers of America foot the bill for a tax cut in Tennessee or Kentucky. I think that's what they were trying to get at. I don't know. What could Congress have done under your theory? What should they have done to make this comply with the spending clause? I think it's helpful that the Treasury defendants in this case have pointed the court repeatedly to maintenance of use statutes and anti-supplanting statutes in which the federal government will routinely tell states specifically rules like if you spend money in this agency, you have to keep that agency's budget the same as it was before. There are ways in which you could really clearly direct the states as to the rules of the road of spending this money and in certain areas and for certain programs or being more specific about what those conditions might be. The rule I think is probably closer if Congress had wanted to codify a rule, but Congress didn't codify that rule. In terms of the ambiguity issue, I think that there are coercion issues. There is a provision saying that Treasury may implement regulations to implement this statute. Why isn't that enough to give them the authority to pass this rule to deal with the ambiguity? Two responses. The first is that the spending clause goes to what Congress has done. I don't think that Congress passing an empty contentless statute and saying an agency will just come up with all of the rules and tell you what it is, I don't think that that has any bearing on the spending clause part because it's Congress' obligation to provide clarity. What should they have said more besides that? What do they need to say? Specifically, Treasury will define these terms? Is that what you're saying? I think because of the uniqueness of the fungibility of money, using the word indirectly offset, they should have to tell the states what they actually mean by that. What if they just said Treasury will define what indirect offset means? I don't think that would be enough to comply with the spending clause requirements. I don't think so. It might be closer. You're saying it's a non-dedicable task that had to be defined by Congress? We raised that in our briefs below that if this was essentially just like a free-for-all for the agency to just, it literally can be anything so the agency just gets to decide what it is, that that could raise other questions, major questions, that kind of thing. Again, focusing on the ambiguity, which I take that the court's questions are focusing on, I think that I just go back to the point that this statute is unique. It is unique because there is no way to give it any meaning, any definition, without the Can I ask you about the dole, I guess it would be the dole argument, the condition argument. It seems to me in NFIB the Supreme Court suggested or said, or if you add up votes, that conditioning new money is really not a problem. That's what this is. Do you have a response to that? The way I understand what the NFIB court was saying was, is that conditioning new money and how you spend new money is normally not a problem because that's a condition on how the funds are being used. Congress has significantly more leeway when they're saying, here's some money, here's how you use it. The question in NFIB when you're talking about coercion is whether or not the states have a genuine choice to accept that. The coercion test is harder for the states to make when they're just being offered money and say, go build bridges with this money. Our position in this case has always been that the phrase indirectly offset broadens that mandate so much. It's no longer just a restriction on how ARPA funds are used. It's not a maintenance of use provision or an anti-supplanting provision that says, take these funds and use them in this way. That's in 802c1 where you have a lot of restrictions on how you use the funds. What it effectively does is control state tax policy independent of how you use ARPA funds. So you're saying that it's an unconstitutional condition? It's an unconstitutional condition. Under the 10th Amendment, what provision is it unconstitutional under? It's unconstitutional under the spending clause because of the coercive nature of the offer. We also argue that it's unconstitutional under the 10th Amendment because the federal government cannot dictate how the states set their tax policy. On the coercion issue, I think the way to think about it is the way the court in NFIB was thinking about the new money versus old money. The court said it was coercive because the states had this old money they were relying on. It would really hurt them if you took it away. The comparison here is the circumstances of the pandemic and the harm that the states were experiencing. The federal government comes along and says, hey, we can help you out. We're the only ones that can help you out because we have unlimited resources. So we're going to give you that help that you need. Don't say you're cutting taxes. We need the money so much. Don't reduce your tax revenue either. One of the problems is that this doesn't just restrict states intentionally trying to lower tax revenue. This restricts states changing their tax policies that result in revenue reductions, whether or not that was intended or not. The Kentucky legislature just went through this issue where they're trying to figure out how to change their sales and income tax. The big cloud hanging over it is that you make a change to your tax code like that. You keep saying that they're trying to restrict how states set their tax policy. It sounds to me like this is not that case. You don't have an identifiable situation where you can say that Kentucky reduces tax policy and the government is saying this violates. It sounds like Kentucky just doesn't want to be accountable and explain why this either does or does not contravene that policy. I'm still not getting how it's controlling the ability for the state to set the tax policy. Judge Donald, I would point you to paragraphs 14 and 15 of the Neek Najad Affidavit, which I think is at record 25-2. There, I think it's the policy director of, I believe, the governor of Tennessee talking about how because of the fungibility of money and the reach of this indirect offset, it immediately caused a disruption in the budgeting process for the state of Tennessee because they don't know how it could apply. They don't know what could or could not be an indirect offset. Anything that they were planning in Tennessee has a history of over the last 10 years or so cutting something like $800 million worth of revenue reductions. They were not able to move forward with that because anything that they do because of the fungibility of money could be deemed an indirect offset. It froze their ability to budget on the tax policies that Tennessee as a sovereign might want to enact. Okay. Time is up. Thank you. Just three quick points. First, to establish jurisdiction, a state has to show a concrete, actual, or imminent injury redressable by the injunction it's trying to get. Neither state, neither Tennessee nor Kentucky, has shown that here through evidence. As to Tennessee's asserted injury, aside from the redressability point, at most it's not an injury arising from the supposed ambiguity of the statute. They're not saying we're confused about what this means and therefore we have to do this. They're saying the statute requires us to do that and it requires us to spend money. Second point, the state's entire case, you heard nothing from my friend to disagree with us. The whole case is premised on an understanding of the statute that it reads or can be read to ban tax cuts. That's inconsistent with its text. It's certainly not required by its text. And the Treasury Department has never adopted it and indeed has foreclosed it. If the state were right about the way... I don't understand. That's not exactly what he was saying. I mean, there's this point, and I understand his point. You know, what do I do, can I change my tax policy from sales tax to property tax or whatever if it happens to result in a reduction in net tax revenue? Is that an indirect offset? Am I going to have a problem under the text of the statute? I mean, they have not pointed to any such concrete injury. And I would note that if that were a basis on which a statute could be held facially unconstitutional, then in all of the cases in which this Court and the Supreme Court have applied the Penner's clarity requirement, the Court wouldn't have said, you know, some people argue that the IDEA requires compensation of extra fees and some have argued it doesn't and therefore, you know, the statute is unconstitutional. Nobody said that. What they said is there's two readings of the statute. We're going to hold that the state had clear notice of one and not of the other. Nobody has ever treated the Penner's clarity requirement as a basis to enjoin the enforcement of a funding condition facially in all contexts on the ground that a state might have a question in some circumstances about exactly how it's going to be applied. And that leads me to the third point, which is it's just not right that this statute is contentless or incomprehensible. Every state that has a balanced budget requirement, and that's almost all of them, knows what it means to offset the negative revenue effects of a tax cut. They know that if they're going to cut taxes and it's going to reduce their revenue, they have to be able to cover that reduction either through an increase in revenue because of economic growth or an increase in other taxes or by cutting their own spending. And as the Eighth Circuit noted in its opinion last week, all that this provision does is say that when a state does that, it has to be able to do it with its own money. It can't say we're going to use these federal funds to make the budget numbers add up. The phrase directly or indirectly, and it should be understood as a phrase for the reason we explain in our supplemental brief, it doesn't change the basic condition against using these funds to offset. That's a phrase Congress uses in many, many statutes, more than a thousand times in the U.S. Code, just to emphasize that you cannot circumvent the basic restriction through formalities. In this case, the formality of taking the federal money. Is there another spending statute like this for involving the states where the directly or indirectly is used? I don't have such an example, Your Honor. It's, as we know in our brief, it's more than a thousand times in the U.S. Code. But don't you think this is a pretty unusual situation where you have a sovereign interest of a state involved and you have a very broad definition of directly or indirectly? That seems could lend itself to multiple interpretations. Your Honor, I think at most what the states have argued is that that phrase shouldn't be read in the way that they would regard as unconstitutional, right? Their argument is you shouldn't read that phrase to allow the statute to ban all tax cuts. Now, again, we don't think there's a concrete controversy. We don't think it's appropriate to address in a facial context. But if the Court disagreed with all that and thought it was appropriate to entertain in a facial context this ambiguity question, the remedy would be to say we're going to mean what they say would not be unconstitutional, and that's exactly what the Treasury Department has said in its rule. We're going to construe this statute not to mean that states can't cut taxes. We're going to construe it to mean that if they cut taxes, they have to be able to do that with their own money. That's a narrowing construction of the statute. It's essentially what this Court and the Supreme Court have done in lots of other cases applying the Pennhurst Clarity Requirement. Judge Bush, I think what you said earlier about what Congress was trying to achieve here is exactly right. It is within the heartland of Congress's power to control the uses of new federal appropriations to say that we want states to use these funds for some purposes and not for other purposes, and we don't think they can use it for the purposes of paying for tax cuts. That restriction was well within Congress's constitutional authority. There's not a concrete controversy here, but even if there is, the statute should be upheld and the injunction reversed. Okay. Thank you, Your Honor. I'll take the case under submission.